FILED

December 23 2014

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0196

DA 14-0196

IN THE SUPREME COURT OF THE STATE OF MONTANA

2014 MT 332

SHERIDAN ELECTRIC CO-OP, INC.,
a Montana rural electric cooperative,

Plaintiff and Appellee,

v.

MONTANA-DAKOTA UTILITIES,
a corporation,

Defendant and Appellant.

APPEAL FROM:    District Court of the Fifteenth Judicial District,
In and For the County of Daniels, Cause No. DV 10-2013-2
Honorable David Cybulski, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Jeffery J. Oven, Steven R. Milch, Crowley Fleck PLLP; Billings, Montana

For Appellee:

Maxon R. Davis, Davis, Hatley, Haffeman & Tighe, P.C.; Great Falls,
Montana

Loren O'Toole, II, O'Toole Law Firm; Plentywood, Montana

Submitted on Briefs:  September 24, 2014
Decided:  December 23, 2014

Filed:

_____
Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1      Montana-Dakota Utilities (MDU) appeals from the judgment of the Fifteenth Judicial District Court, Daniels County, granting Sheridan Electric Co-op, Inc.'s (Sheridan) motion for summary judgment and denying MDU's motion for summary judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2      The material facts are not in dispute.  Sheridan is a Montana rural electric cooperative. MDU is an electric services provider.  Both serve customers in the Madoc/Scobey area in Daniels County.  Cahill Seeds, Inc. (Cahill) is a farm and seed retail business located approximately six miles east of Scobey, near the intersection of Highway 5 and North Madoc Road.

¶3      In 2011, Cahill began planning the construction of a new seed washing plant and submitted initial requests for electric service to MDU and Sheridan.  The request stated that Cahill would require three-phase Wye power to operate the plant.

¶4      When Cahill made its request Sheridan had an existing distribution line carrying three-phase Wye power approximately 1.33 miles north of the Cahill site.  Meanwhile, MDU had an existing line carrying three-phase Wye power located approximately 6.5 miles west of Cahill.  MDU also had an existing transmission line carrying three-phase Delta power running along Highway 5, and a distribution line connected to that transmission line at its Madoc Substation, near the junction of Highway 5 and North Madoc Road, approximately 300 feet from Cahill.

¶5 Sheridan responded to Cahill's request, stating that it could provide three-phase Wye power with the construction of a 1.33 mile line extension connecting its distribution line to Cahill. MDU told Cahill that it could not provide three-phase Wye power.

¶6 In September 2011, Cahill began building the seed washing plant. To provide power during construction, MDU installed a pole-mount transformer along the distribution line and extended a 285 foot single-phase service line to Cahill.

¶7 During 2012 and 2013, as construction neared completion and Cahill began to install equipment requiring three-phase Wye power, MDU upgraded its transmission and distribution systems near Cahill. MDU replaced the transformer at the Madoc substation with a Wye transformer, added a fourth "neutral" wire to the distribution line, replaced the pole mount transformer on the distribution line with a three-phase padmount transformer, and replaced the single-phase service line with three-phase service line. These upgrades allowed MDU to provide three-phase Wye power to Cahill.[1] After completing its upgrades, MDU began providing three-phase Wye power to Cahill.

¶8 On January 14, 2013, prior to MDU completing its upgrades, Sheridan filed a complaint in District Court. Sheridan alleged that MDU violated the Montana Territorial Integrity Act (MTIA) when it extended power to Cahill. Sheridan argued that under the priority provisions of the MTIA it had the exclusive right to serve Cahill because it had a line capable of delivering three-phase Wye power located 1.33 miles away from Cahill, while MDU's closest capable line was 6.5 miles away from Cahill. According to Sheridan,

_____

[1] An MDU employee testified that the fourth wire was a common addition to three-phase Wye lines but not a necessity.

MDU's nearby distribution line did not meet the requirements of the MTIA because substantial upgrades to MDU's distribution system were required to send three-phase Wye power along the line.

¶9      MDU responded, arguing that the MTIA only required that the "line" itself need have the capacity to carry the requisite load. MDU pointed out that the line itself had the physical capacity to carry three-phase Wye power, and only the transformers needed to be upgraded to provide three-phase Wye to Cahill.

¶10     Both sides moved for summary judgment. The District Court ruled in favor of Sheridan, finding that the 1.33 mile distance from Sheridan's three-phase Wye transmission line to Cahill gave Sheridan priority over MDU, whose three-phase line was 6.5 miles away. MDU appeals.

## STANDARDS OF REVIEW

¶11     We review a district court's grant of summary judgment de novo. *Scentry Biologicals, Inc. v. Mid-Continent Cas. Co.*, 2014 MT 39, ¶ 23, 374 Mont. 18, 319 P.3d 1260. We review a district court's interpretation of a statute for correctness. *State v. Madsen*, 2013 MT 281, ¶ 8, 372 Mont. 102, 317 P.3d 806.

## DISCUSSION

¶12     We restate the issue as follows:

¶13     *1. Did the District Court err in finding that Sheridan had the right to serve Cahill under the priority provisions of the MTIA?*

¶14 MDU asks us to reverse the District Court for three reasons. First, because MDU had the exclusive right to serve Cahill under § 69-5-105(1), MCA, by virtue of having the line nearest to Cahill with the capacity to serve Cahill. Second, because MDU added Cahill to its service territory when it began delivering single-phase construction power to Cahill in September 2011, and therefore Sheridan was prohibited from serving Cahill by § 69-5-104, MCA. Third, because granting priority to Sheridan would violate public policy and the legislative intent of the MTIA.

¶15 We will address each argument in turn.

### When Cahill submitted its request for three-phase Wye power, did MDU have priority to serve Cahill under § 69-5-105(1), MCA?

¶16 We first address the question of when a provider's facilities are measured for purposes of determining priority for serving new consumers under the MTIA. Timing is important where, as in this case, an electric facilities provider is upgrading its facilities during the pendency of a dispute. The District Court implicitly held that priority should be determined at the time Cahill approached Sheridan and MDU about providing electric services. We agree.

¶17 Section 69-5-105(1), MCA, "Service to new consumers," states:

> Except as provided in 69-5-106 and 69-5-113, the electric facilities provider that has a line nearest the premises and that has the capacity to serve the premises, as measured in accordance with subsection (2), shall provide electric service facilities to the premises initially requiring service after May 2, 1997.

Without a premises in existence the statute would have no meaning. Furthermore, the statute clearly contemplates new premises, that is, premises that have recently come into existence. MTIA defines "premises" as "a building, residence, structure, irrigation pump, or facility to

5

which electrical service facilities are provided or are to be installed." Section 69-5-102(12), MCA. When Cahill solicited bids for electrical services in early 2011, the plant became a "facility to which electrical services . . . [were] to be installed" which is to say a premises. The need to evaluate each party's electrical service facilities arose at that time. Thus in assessing priority we will consider only the electric service facilities each party had in place when Cahill made its request for electrical service.

¶18    Having determined that we will only consider a provider's electrical service facilities already in place in early 2011, we turn to the question of which party had priority under the MTIA. The answer to this question hinges upon the meaning of § 69-5-105(1), MCA.

¶19    MDU contends that the term "capacity" as used in § 69-5-105(1), MCA, refers to the physical capacity of the *line* as defined by § 69-5-102(11), MCA. "'Line' means any material that is used to convey electrical energy and that is normally energized between 2,400 volts phase to ground and 14,400 volts phase to ground." Section 69-5-102(11), MCA. Under MDU's interpretation of the statute, MDU had priority because, at the time Cahill submitted its request for power, the line itself had the capacity to deliver three-phase Wye power, despite the fact that MDU's nearby substation did not have the capacity to send three-phase Wye power down the line.

¶20    An alternative interpretation is that the statute requires the *electric facilities provider* to have the capacity to actually send the load down the line. "'Electric facilities provider' means any utility that provides electric service facilities to the public." Section 69-5-102(6), MCA. "'Electric service facilities' means any distribution or transmission system or related facility necessary to provide electricity to the premises, including lines." Section

6

69-5-102(7), MCA. Under this interpretation, Sheridan would have priority because its nearest distribution system, including line, was actually carrying three-phase Wye when Cahill made its request, while MDU's distribution system required a substation upgrade in order to carry three-phase Wye.

¶21 The plain language of § 69-5-105(1), MCA, supports the latter interpretation. The sentence comprising § 65-5-105(1) contains two relative clauses: "that has a line nearest the premises," and "that has the capacity to serve the premises." Each clause begins with the relative pronoun "that." The meaning of the statute rests on which noun, "electric facilities provider" or "line," is antecedent to which relative pronoun. Under MDU's interpretation "electric facilities provider" is antecedent to the first and "line" is antecedent to the second. However, the statute states: "the electric facilities provider that has a line nearest the premises *and* that has the capacity to serve the premises. . . ." Section 65-5-105(1), MCA (emphasis added).[2]

¶22 Here, the "and" is dispositive. Its placement in the sentence compels the conclusion that "electric facilities provider" is antecedent to both relative pronouns and therefore is the subject of each relative clause. Thus it is the "electric facilities provider" that must "[have] a

---

[2] As part of its argument, MDU notes that the statute does not define "capacity" and correctly states that when a term is not defined by statute we consider that term to have its plain and ordinary meaning. In support of its position that the term "capacity" refers only to the line itself, MDU quotes Webster's Third New International Dictionary, defining "capacity" as "the power or ability to hold, receive, or accommodate." This definition is indeed appropriate when referring to the capacity of an electrical line. However, another equally plain and ordinary meaning of "capacity" is "the ability to . . . process . . . manufacture, or produce." Webster's Third New International Dictionary 330 (1961). This definition is appropriate when referring to the capacity of an electrical facilities provider. The "plain and ordinary meaning" doctrine as applied to the term "capacity" does not lend support to either interpretation.

line nearest the premises" and it is the "electric facilities provider" that must "[have] the capacity to serve the premises."

¶23    Therefore, under § 69-5-105(1), MCA, an electric facilities provider that has the line nearest the premises and that has the distribution system (including lines) with the capacity to provide electricity to the premises "shall provide electric service facilities to the premises. . . ."  Section 69-5-105(1), MCA.

¶24    While it is undisputed that MDU's distribution *line* had the capacity to supply three-phase Wye power, we conclude that MDU did not meet the requirements of § 69-5-105(1), MCA, because its distribution and transmission facilities did not have the capacity to provide three-phase Wye without a significant upgrade to its nearby substation. When Cahill made its request for three-phase Wye power in 2011, MDU's nearest line with the distribution and transmission facilities necessary to provide three-phase Wye were more than six miles away, while Sheridan had a line with the necessary facilities less than two miles away.  Therefore, the District Court did not err when it determined that Sheridan had priority to serve Cahill under § 69-5-105(1), MCA.

**Did Cahill become part of MDU's "service territory" when it provided single-phase electricity to Cahill during the construction of the facility?**

¶25    MDU argues that when it provided single-phase construction power to Cahill in September 2011, it added Cahill to its service territory, thus precluding Sheridan from providing electricity to Cahill pursuant to § 69-5-104, MCA.  That statute states that "a utility may not provide electricity supply service to premises in another utility's service territory."  § 69-5-104(1), MCA.  A "service territory" is defined as "premises receiving

8

distribution service from a utility on January 1, 2011, and premises added pursuant to Title 69, chapter 5." Section 69-5-102(14), MCA.

¶26    Because MDU was not providing distribution service to Cahill on January 1, 2011, Cahill could only be made a part of MDU's service territory if it was added pursuant to Title 69, chapter 5. Under Title 69, chapter 5, priority for service to new customers is determined by § 69-5-105(1), MCA. We have already concluded that Sheridan had priority in providing electric services to Cahill under that section.[3] Hence, when MDU extended single-phase electrical service to Cahill, it did not do so pursuant to Title 69, chapter 5. Thus, MDU providing construction power to Cahill did not result in Cahill being added to MDU's service territory. Section 69-5-104(1), MCA, therefore, grants no priority to MDU and does not prohibit Sheridan from providing electricity supply service to Cahill.

### Would granting Sheridan priority to serve Cahill violate the legislative intent behind the MTIA?

¶27    MDU urges us to reverse the District Court because granting Sheridan priority to serve Cahill would violate the legislative intent behind the MTIA. In interpreting a statute "the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." § 1-2-101, MCA. If the language of the statute is unambiguous "no further interpretation is required, and we will resort to legislative history only if legislative intent cannot be determined from the plain wording of the statute." *Clarke v. Massey*, 271 Mont. 412, 416, 897 P.2d 1085, 1088 (1995).

---

[3] *See supra*, ¶¶ 15-23.

¶28 Because we have found that the language of § 69-5-105(1), MCA, unambiguously grants priority to the electric facilities provider that has both the line nearest the premises and the capacity to serve the premises we will not look to legislative history in interpreting the statute further. The statute clearly grants priority to Sheridan.

## CONCLUSION

¶29 We conclude that the language of § 69-5-105(1), MCA, unambiguously grants priority to Sheridan because it had the line closest to Cahill and the distribution system capacity to serve Cahill. Based on that finding, we determine that MDU did not add Cahill to its service territory pursuant to Title 69, chapter 5, when it extended single-phase construction power to Cahill in September 2011. We decline to resort to an examination of legislative history where the statute in question is unambiguous.

¶30 For the foregoing reasons, we hold that the District Court did not err in finding that Sheridan has the right to serve Cahill under the priority provisions of the MTIA.

¶31 Affirmed.

/S/ MICHAEL E WHEAT

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ PATRICIA COTTER
/S/ BETH BAKER
/S/ JIM RICE

10